UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ANGELA VANSELOW O/B/O,              Case No. 1:11-cv-616
D.R.V., MINOR,
      Plaintiff,                         Beckwith, J.
                                      Litkovitz, M.J.

     vs

COMMISSIONER OF              **REPORT AND**
SOCIAL SECURITY,             **RECOMMENDATION**
      Defendant.

      Angela Vanselow, on behalf of her son, D.R.V. (plaintiff), brings this action pursuant to

42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social

Security (Commissioner) denying plaintiff's application for children's Supplemental Security

Income (SSI) disability benefits. This matter is before the Court on plaintiff's Statement of

Errors (Doc. 15) and the Commissioner's response in opposition. (Doc. 20).

**I. Procedural Background**

      Plaintiff was born in August 2007 and was 2 years, 10 months old at the time of the

administrative law judge's (ALJ) decision. Plaintiff's mother, Angela Vanselow, filed an

application for SSI benefits on his behalf in December 2007, alleging disability due to a cleft

palate, speech delay, hearing loss secondary to chronic ear infections, motor skills deficits, and

some behavior problems. (Tr. 166). His application was denied initially and upon

reconsideration. Plaintiff requested and was granted a de novo hearing before ALJ Christopher

McNeil. Plaintiff's mother, who was represented by counsel, appeared and testified on behalf of

plaintiff at the ALJ hearing. A medical expert (ME) also appeared and testified at the ALJ

hearing. On July 1, 2010, the ALJ issued a decision denying plaintiff's SSI application. (Tr. 9-

23). The Appeals Council denied plaintiff's request for review, making the decision of the

ALJ the final administrative decision of the Commissioner. (Tr. 1-4).

## II. Medical Evidence

### A. Treatment History and State Agency Opinions

Plaintiff's newborn hearing screening showed he failed to pass in his right ear on the day he was born, but he passed the subsequent test taken the next day. (Tr. 391).

The record contains treatment notes from Pierre Manfroy, M.D., plaintiff's pediatrician from his birth in August 2007 until January 2010. (Tr. 325-52, 359-97). Plaintiff was diagnosed with a cleft palate shortly after birth. (Tr. 392). Plaintiff saw Dr. Manfroy for check ups, ear infections, and for assessments leading up to the repair of his cleft palate. In 2009, plaintiff was also found to have unexplained high levels of lead in his body. (Tr. 328-29, 363).

When plaintiff was 11 days old, he was evaluated for his cleft palate by Patricia L. Bender, R.N., M.S.N., and Howard D. Saal, M.D., a specialist in clinical genetics. (Tr. 220-23). The pregnancy history was complicated by pneumonia and bronchiolitis, and plaintiff's mother reported she smoked 3/4 a pack of cigarettes per day, and was being treated at the time with codeine for cough and Wellbutrin for depression. (Tr. 220). Dr. Saal assessed plaintiff with a U-shaped cleft palate that involved approximately 30% of his soft palate. (Tr. 221). In the general information section of his consultation report, Dr. Saal remarked that chronic ear infections were a universal problem with cleft palate children, and almost all children with cleft palate require at least one set of tympanostomy tubes.[1] (Tr. 222). Plaintiff was scheduled for a consultation with a plastic surgeon to discuss closure of the cleft palate. (Tr. 223).

Plaintiff consulted with otolaryngologist, Charles M. Myer, III, M.D., in November 2007. (Tr. 207-17). Dr. Myer found middle ear fluid bilaterally and recommended tube placement

---

[1]Tympanostomy tubes, also known as pressure equalization tubes, create an airway that ventilates the middle ear and prevents the accumulation of fluids behind the eardrum. *See* http://www.mayoclinic.com/health/ear-tubes.

2

when plaintiff would have surgery to repair his cleft palate. (Tr. 210). The hearing test taken

during this consultation confirmed right ear hearing loss compared to left. (Tr. 213).

Dr. Manfroy prepared a teledictation report to the state agency in January 2008 wherein

he summarized plaintiff's treatment to date noting at that, at the time of the report, plaintiff was

not on any medications and was not receiving any therapy, but will do speech therapy when he is

a little bit older. Dr. Manfroy reported that due to the cleft palate, plaintiff did have some

feeding issues and numerous doctors' appointments. Plaintiff was being followed by the

genetics clinic and plastic surgery clinics at Cincinnati Children's Hospital. (Tr. 230-31).

On March 3, 2008, Dr. Saal saw plaintiff for a 10 minute follow-up office consultation

and noted that he had not seen plaintiff since the initial evaluation in August 2007. (Tr. 235).

Plaintiff recently had a middle ear infection, but was not taking antibiotics because his mother

had misplaced the prescription. *Id*. Although initially plaintiff was scheduled to have his palate

closed in April 2008, his parents "had not begun working on feeding [plaintiff] from a cup." (Tr.

235-36). Plaintiff was noted as having a normal newborn hearing screen and a small amount of

reflux, with no significant emesis. (Tr. 235). A review of systems for respiratory, GU,

musculoskeletal, skin, neuro, psych, endocrine, and hematology were all within normal limits.

*Id*. Physical examination revealed normal findings, though plaintiff was noted as having a left

pupil larger than right, mild micrognathia of the mouth, and cleft of the soft palate only. (Tr.

236). Dr. Saal provided a replacement antibiotic prescription to treat plaintiff's current ear

infection and "plan[ned] on working with the family in order to ensure that they are ready to

move forward with palate surgery." (Tr. 237). The surgery was moved back to June 2008. (Tr.

237).

3

On August 24, 2007, plaintiff followed up with Patricia Bender, RN, MSN, of Dr. Saal's office. (Tr. 238-41). At that time, plaintiff was eating from a regular bottle and his development was noted as being within the normal range. (Tr. 238). Physical examination yielded normal results aside from the cleft palate and mild micrognathia. (Tr. 239).

In April 2008, opthamologist Robert North, M.D., reported that he first saw plaintiff in October 2007, noting that plaintiff had unequal pupil size, but he was unable to assess plaintiff's vision due to his age; there was no evidence of visual impairment at that time. (Tr. 243-48). In July 2008, Dr. North completed a state agency questionnaire listing plaintiff's diagnoses as unequal pupils, far sightedness, and astigmatism. (Tr. 270). When seen in August 2008, Dr. North concluded that plaintiff had good vision and good alignment. His pupils were unequal, but this appeared to be physiologic. (Tr. 299).

On May 26, 2008, plaintiff attended his pre-operative appointment with plastic surgeon Jesse Taylor, M.D., for his upcoming cleft palate reconstruction. (Tr. 265). Dr. Taylor reported that plaintiff had been growing and feeding quite well and had no interval past medical history or medications, other than a course of medication for oral thrush. *Id.* Dr. Taylor also reported that plaintiff had a V-shaped cleft palate and not U-shaped. *Id.*

State agency physician Malika Haque, M.D., reviewed the file in May 2008 and found that even though plaintiff has a cleft palate, his functioning was all age appropriate.[2] (Tr. 250). Dr. Haque opined that plaintiff's cleft palate is a severe impairment, but it does not meet or equal any Listing. (Tr. 251). Specifically, Dr. Haque opined that plaintiff had no limitations in any domain except for having a "less than marked" limitation in health and physical well-being due

---

[2] Dr. Haque's notation further provides that plaintiff "is doing very with growth development . . . ." (Tr. 250). Due to the omission of an adjective describing plaintiff's growth development, the Court is unable to discern Dr. Haque's opinion in this regard.

4

to having a cleft palate. (Tr. 253-54). State agency physician John L. Mormol, M.D., affirmed Dr. Haque's assessment as written in August 2008. (Tr. 285).

Plaintiff underwent the initial placement of tympanostomy tubes in his ears on June 17, 2008, when he was ten months old. (Tr. 260-63; 368-69).

Dr. Manfroy, prepared another teledictation report to the state agency in August 2008 noting at that time, plaintiff was scheduled to have a cleft palate repair, which was recently postponed to July 29, 2008. Because of his cleft palate, plaintiff did have feeding issues. Dr. Manfroy believed that "the issue with the mother is that it's hard for other people to feed him with his cleft palate, and perhaps that's why she needs disability." An MRI of plaintiff's brain was normal. (Tr. 282).

Plaintiff was treated for cough and an ear infection on September 5, 2008. (Tr. 344).

On October 23, 2008, plaintiff was diagnosed with a viral illness and cough and congestion were noted. (Tr. 343). Plaintiff was treated for vomiting and diarrhea on October 29, 2008. (Tr. 342). Plaintiff was noted as wheezing and having a cough and was given albuterol. *Id.*

Dr. Taylor noted in January 2009 that plaintiff's cleft palate repair surgeries were cancelled twice due to viral illness and requested that his primary care doctor work him up for a possible immune deficiency if he believed that was reasonable. (Tr. 296). Dr. Taylor noted plaintiff's current physical examination was "essentially normal, thus it is beyond me what might be going on here." *Id.*

On April 30, 2009, plaintiff underwent cleft palate repair surgery at Children's Hospital. (Tr. 293). Plaintiff was in good condition post-surgery; there were no complications. (Tr. 294).

5

Dr. Manfroy saw plaintiff on June 2, 2009 and noted that he was doing well, eating well, and not in pain. (Tr. 292). Dr. Manfoy found that plaintiff had an issue with not babbling and speaking at the level he should for his age and referred him to speech therapy. *Id.*

In August 2009, when plaintiff was 2 years old, he was evaluated by speech pathologist Janet Middendorf, M.A. (Tr. 289-91). Plaintiff had a vocabulary of about 20 words, was able to combine a few two-word phrases, and could imitate words overheard in conversation and two-word phrases, but he could not identify three body parts or clothing items. (Tr. 290). He understood instructions such as "sit down" and "come here." *Id.* He demonstrated reciprocal smiling, appropriate affect, turn-taking, and attention to the speaker. *Id.* Based on this evaluation, Ms. Middendorf concluded that plaintiff demonstrated some impairment in his receptive and expressive language skills, with his expressive skills being lower than his receptive skills. (Tr. 291). His observed speech did not seem to have current traits of hypernasality; however, she felt this would need to be monitored as his speech and language develop. *Id.* She recommended that plaintiff could benefit from speech and language therapy and the family was counseled regarding early intervention services through the Help Me Grow program.[3] (Tr. 289-91).

Also in August 2009, Dr. North saw plaintiff for a follow-up. (Tr. 287-88). Dr. North assessed astigmatism and unequal pupils. (Tr. 287). Plaintiff was to follow up in one year. *Id.*

Plaintiff was treated for cough and congestion on September 3, 2009. (Tr. 330).

Plaintiff's parents met with Sarah Parsons from the Help Me Grow program on October 7, 2009, to assess plaintiff for services to be provided by the program. (Tr. 424-37). At 25

---

[3] Help Me Grow is a system of local services guided by the Ohio Department of Health for children up to age 3 which focuses of infant and toddler development. *See* www.odh.ohio.gov/sitecore/content/HelpMeGrow/default.aspx; http://www.ohiohelpmegrow.org.

months of age, plaintiff was in the 21-22 month range for cognitive problem solving, the 25+ month range for physical, gross, and fine motor skills, the 24 month range for expressive communication and language skills, but in the 16 month range for receptive language skills, where it was noted he uses 10 words, strings words together in babbling, but is hard to understand. (Tr. 434). Plaintiff was found to be in the 21 to 24 month range for personal, social and emotional development, and the 25 month range for adaptive and self-help skills. (Tr. 435).

On October 12, 2009, plaintiff was evaluated through the Early Intervention Program of Butler County. (Tr. 301-20; 354). The evaluator reported that plaintiff could drink through a straw, a sippy cup, and an open cup without assistance. (Tr. 301, 304). Plaintiff's parents reported that he still took a bottle; the evaluator encouraged the parents to stop using a bottle and use a sippy cup or straw all the time. (Tr. 301). The evaluator also determined that plaintiff could feed himself and remove his shoes and clothing without assistance. (Tr. 304). Activities were suggested to help strengthen/build pressure in plaintiff's mouth. (Tr. 301).

Plaintiff was seen for his 2-3 year check-up on October 15, 2009. (Tr. 329). Plaintiff was reported as having normal physical examination results and good hearing. He used two to three word sentences, but his vocabulary was below 50 words. *Id.*

Plaintiff underwent treatment for dental caries on December 18, 2009, which included restorations on four surfaces and extraction of four teeth. (Tr. 419).

On January 1, 2010, plaintiff was treated at the emergency room for a cough, ear infection, vomiting, diarrhea, and conjunctivitis. (Tr. 415-18). Plaintiff was prescribed eye drops, amoxicillin, and ibuprofen and discharged. (Tr. 418).

7

In January 2010, on a home visit from the Early Intervention Program, the evaluator found that plaintiff used about 15 words and knew all of his body parts. (Tr. 422). She suggested using a hard sippy cup or a straw instead of a bottle to exercise his tongue. (Tr. 422).

In February 2010, when plaintiff turned three years old, an Early Intervention Program checklist for transition was completed. (Tr. 429-31). That same month, the service provider from the Early Intervention Program noted plaintiff was a little shy at first, but warmed up after a few minutes during his home visit. (Tr. 421).

### B. Medical Expert

Prior to the administrative hearing, the ME, John DiTraglia, M.D., a pediatrician, reviewed the record and completed interrogatories. (Tr. 398-413). Dr. DiTraglia opined that plaintiff's cleft palate is a severe impairment, which has led to feeding difficulties, speech problems, and frequent ear infections. (Tr. 408). Dr. DiTraglia determined that plaintiff's impairment did not meet or equal a Listing. (Tr. 410). Further, he evaluated plaintiff's functioning in the six domains and opined that plaintiff had "less than marked" limitations in the domain of acquiring and using information and the domain of health and physical well-being, and no limitations in the other four domains. (Tr. 411-12).

Dr. DiTraglia, testified at the administrative hearing that he felt plaintiff was less than markedly limited in the domain of health and physical well being because "the child functions largely in an age-appropriate manner." (Tr. 47-48). Dr. DiTraglia did not "quote specific exhibits" to support his opinion but noted the record shows that plaintiff "does things on an age-appropriate level" such as walking. (Tr. 48). He acknowledged that the records show that plaintiff has problems with speech delays and an "intermittent" problem with hearing that would be expected to arise from plaintiff's cleft palate. (Tr. 48). He noted that due to plaintiff having

8

surgeries for his problems, they were self-limited. (Tr. 48-49). Dr. DiTraglia did say that he would consider a speech or language impairment to be markedly limiting if a child performed similarly to someone half that child's age or younger. (Tr. 50). Dr. DiTraglia testified that a two year old was not expected to say a lot, and it was very difficult to assess how far behind plaintiff would be in the future. (*Id.*). He explained that it was "not unusual" for a child to have frequent ear infections and a child with cleft palate would be expected to have frequent ear infections and problems with fluid in his ears. (Tr. 51). Dr. DiTraglia opined that the cleft palate, with the issues it brings, does not rise to a marked severity in health and physical well being. (*Id.*).

Dr. DiTraglia acknowledged that healthy children generally have three to five ear infections within the first three years of their lives. (Tr. 52). When discussing dental work, Dr. DiTraglia agreed that most children younger than age three do not require extensive dental work under anesthesia. (Tr. 54). Dr. DiTraglia also agreed that most two year old children do not still drink from a bottle (Tr. 55), and that children who have problems communicating would be expected to have more behavior outbursts. (Tr. 55).

Dr. DiTraglia completed a second set of interrogatories which essentially asked Dr. DiTraglia whether the additional exhibits submitted after the hearing caused him to change the opinion he provided during the hearing. Dr. DiTraglia responded that they did not; according to Dr. DiTraglia, the first exhibit related to a "self-limiting illness," and the latter two exhibits were developmental assessments which showed normal findings except for "some speech problems." (Tr. 438-40).

9

## III. Analysis

### A. Legal Framework for Children's SSI Disability Determinations

To qualify for SSI, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. *Id.*; 20 C.F.R. § 416.202. An individual under the age of 18 is considered disabled for purposes of SSI "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Social Security regulations set forth a three-step sequential analysis for determining whether a child is disabled for purposes of children's SSI benefits:

1. Is the child is engaged in any substantial gainful activity? If so, benefits are denied.

2. Does the child have a medically severe impairment or combination of impairments? If not, benefits are denied.

3. Does the child's impairment meet, medically equal, or functionally equal any in the Listing of Impairments, Appendix I of 20 C.F.R. pt. 404, subpt. P. 20 C.F.R. § 416.924(a)? If so, benefits are granted.

20 C.F.R. § 416.924(a)-(d). An impairment which meets or medically equals the severity of a set of criteria for an impairment in the Listing, or which functionally equals a listed impairment, causes marked and severe functional limitations. 20 C.F.R. § 416.924(d).

In determining whether a child's impairments functionally equal the Listings, the adjudicator must assess the child's functioning in six domains:

10

      1. Acquiring and using information;

      2. Attending and completing tasks;

      3. Interacting and relating with others;

      4. Moving about and manipulating objects;

      5. Caring for yourself; and

      6. Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi).  To functionally equal an impairment in the Listings, an

impairment must result in "marked" limitations in two domains of functioning or an "extreme"

limitation in one domain.  20 C.F.R. § 416.926a(d).  The relevant factors that will be considered

in making this determination are (1) how well the child initiates and sustains activities, how

much extra help he needs, and the effects of structured or supportive settings; (2) how the child

functions in school; and (3) how the child is affected by his medications or other treatment.  20

C.F.R. § 416.926a(a)(1)-(3).

      An individual has a "marked" limitation when the impairment "interferes seriously with

[the] ability to independently initiate, sustain, or complete activities."  20 C.F.R. §

416.926a(e)(2)(i).  A "marked" limitation is one that is "more than moderate" but "less than

extreme."  *Id.*  An "extreme" limitation exists when the impairment "interferes very seriously

with [the] ability to independently initiate, sustain, or complete activities."  20 C.F.R. §

416.926a(e)(3)(i).  An extreme limitation may also seriously limit day-to-day functioning.  *Id.*

      If the child's impairments meet, medically equal, or functionally equal the Listings, and if

the impairments satisfy the Act's duration requirement, then the child is considered disabled.  20

C.F.R. § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not

considered disabled. 20 C.F.R. § 416.924(d)(2).

In determining functional equivalence, the ALJ must consider the "whole child." Social

Security Ruling 09-1p. The "whole child" approach to functional equivalence requires the ALJ

to consider the following questions:

> 1. How does the child function? "Functioning" refers to a child's activities; that is, everything a child does throughout the day at home, at school, and in the community, such as getting dressed for school, cooperating with caregivers, playing with friends, and doing class assignments. We consider:

> > • What activities the child is able to perform,

> > • What activities the child is not able to perform,

> > • Which of the child's activities are limited or restricted,

> > • Where the child has difficulty with activities-at home, in childcare, at school, or in the community,

> > • Whether the child has difficulty independently initiating, sustaining, or completing activities,

> > • The kind of help, and how much help the child needs to do activities, and how often the child needs it, and

> > • Whether the child needs a structured or supportive setting, what type of structure or support the child needs, and how often the child needs it.

> 2. Which domains are involved in performing the activities? We assign each activity to any and all of the domains involved in performing it. Many activities require more than one of the abilities described by the first five domains and may also be affected by problems that we evaluate in the sixth domain.

> 3. Could the child's medically determinable impairment(s) account for limitations in the child's activities? If it could, and there is no evidence to the contrary, we conclude that the impairment(s) causes the activity limitations we have identified in each domain.

12

4.  To what degree does the impairment(s) limit the child's ability to function age-appropriately in each domain?  We consider how well the child can initiate, sustain, and complete activities, including the kind, extent, and frequency of help or adaptations the child needs, the effects of structured or supportive settings on the child's functioning, where the child has difficulties (at home, at school, and in the community), and all other factors that are relevant to the determination of the degree of limitation.

SSR 09-1p (internal citations omitted).  Importantly, SSR 09-01p goes on to state:

However, we do not require our adjudicators to discuss all of the considerations in the sections below in their determinations and decisions, only to provide sufficient detail so that any subsequent reviewers can understand how they made their findings.

## B.  The Administrative Law Judge's Findings

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born [i]n August 2007.  Therefore, he was a newborn/young infant on November 30, 2007, the date application was filed, and is currently an older infant (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity since November 30, 2007, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairment: cleft palate (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926a).

6. The claimant has not been disabled, as defined in the Social Security Act, since November 30, 2007, the date the application was filed (20 CFR 416.924(a)).

(Tr. 12-23).

In determining that plaintiff's impairments were not functionally equivalent to a listed

impairment, the ALJ found:

> 1. Plaintiff has less than marked limitation in acquiring and using information. (Tr. 18).
>
> 2. Plaintiff has no limitation in attending and completing tasks. (Tr. 19).
>
> 3. Plaintiff has less than marked limitation in interacting and relating to others. (Tr. 20).
>
> 4. Plaintiff has no limitation in moving about and manipulating objects. (Tr. 21).
>
> 5. Plaintiff has no limitation in the ability to care for himself. (Tr. 22).
>
> 6. Plaintiff has less than marked limitation in health and physical well-being. (Tr. 23).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007)). *See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545–46 (6th Cir. 2004) (reversal required even though ALJ' s decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ erred by failing to properly account for all of plaintiff's limitations within the domain of "health and physical well-being;" (2) the ALJ erred by failing to properly account for all of plaintiff's limitations within the domain of "interacting and relating with others;" (3) the ALJ failed to make an explicit credibility finding regarding plaintiff's mother's testimony; and (4) the ALJ's method of sending post-hearing interrogatories to Dr. DiTraglia violated plaintiff's rights to due process.

1. The ALJ's finding that plaintiff has less than marked limitation in health and physical well-being is supported by substantial evidence.

In determining that plaintiff has less than marked limitation in the domain of health and physical well-being, the ALJ stated:

> The record establishes that while the [plaintiff]'s cleft palate has been successfully treated, there remain limitations secondary to that impairment that

15

result in limitations in his health and physical well-being. Notably in this domain, Dr. DiTraglia opined that there will be a continued need for reviewing the [plaintiff]'s speech, and the clearly demonstrated likelihood of recurrent ear problems. Similarly, although it preceded the repair of the [plaintiff]'s cleft palate, Dr. Haque observed that the [plaintiff] was doing well in his growth and development. Subsequent to the issuance of this opinion, the child has of course continued to grow, but he has indeed experienced some limitations because of his impairment. The frequent trips to medical treatment sources, and the likelihood that some continued medical attention will be called for, establishes a less than marked degree of limitation.

(Tr. 23) (internal citations omitted).

Plaintiff takes issue with the ALJ's finding that the illnesses secondary to plaintiff's cleft palate result in a finding that plaintiff has less than marked limitation in the domain of health and physical well-being. Plaintiff asserts that his ear infections and associated hearing-loss, frequent illnesses, and dental problems create serious limitations in this domain. Further, plaintiff contends that the ALJ erred by excluding a detailed discussion of how his recurrent ear infections add to his limitations.

The health and physical well-being domain considers the cumulative physical effects of physical and mental impairments and their associated treatments on a child's health and functioning. *See* Social Security Ruling 09-8p. This domain addresses the effect of recurrent illness, the side effects of medication, and the effect of the need for ongoing treatment on the child's body. *Id.*

The ALJ's finding that plaintiff has less than marked limitation in health and physical well-being is substantially supported by the record. The ALJ acknowledged that plaintiff's chronic ear problems and frequent trips to medical providers result in limitations to his health

16

and well-being, but not to the extent of a marked limitation. In this regard, the ALJ reasonably

considered evidence showing varying degrees of limitations cause by plaintiff's recurrent ear

infections. The record shows that while plaintiff failed his newborn hearing screening in his

right ear (Tr. 213, 238, 391), he passed the screening on the following day. (Tr. 391; *see also* Tr.

235). At three months of age, plaintiff was noted as having decreased hearing in his right ear

(Tr. 213) and at 10 months old had tympanostomy tubes placed in his ears. (Tr. 260-61).

Although there are notations in the record that plaintiff's ear tubes had fallen out and might need

to be replaced (Tr. 422, 425, 436) and that plaintiff had several instances of ear infections and/or

treatment for ear pain and purulence between November 2007 and January 2010 (Tr. 213, 235-

36, 333-34, 344, 416-18), this evidence in itself does not indicate that plaintiff's health and well-

being were further compromised. A September 2009 Help Me Grow assessment indicated

plaintiff will need further hearing screening (Tr. 435), but at plaintiff's two to three year check-

up his hearing was assessed as "hears well." (Tr. 329). The ALJ considered the above evidence

in his decision and specifically noted Dr. DiTraglia's testimony that plaintiff will likely have

recurrent ear problems. *See* Tr. 14, 23. Plaintiff has not identified any evidence from a medical

source demonstrating that plaintiff has experienced an inordinate number of ear infections or

hearing loss due to his cleft palate that results in a marked limitation in the health and physical

well-being domain.[4] Given the dearth of evidence supporting a finding that plaintiff's secondary

---

[4] Plaintiff appears to argue that he has a marked limitation due to the frequency of, and likely ongoing
treatment for, ear problems. (Doc. 15 at 13-14). Plaintiff relies on the ME's testimony to assert that he experiences
more ear infections than the average child and, thus, is markedly limited in the health and well-being domain. *Id*.
This argument is unpersuasive. Whether plaintiff experiences more or less than the average number of ear
infections says nothing about how his illnesses limit him. Further, the possibility that plaintiff *may* continue to

17

ear problems markedly limit his health and physical well-being, the ALJ's decision to the contrary is substantially supported.

Turning to plaintiff's dental treatment, the record includes evidence that he required surgery on one occasion to treat dental caries[5] when he was two years old. (Tr. 419). There is no evidence in the record that plaintiff's tooth decay was in any way related to his cleft-palate, would be a recurring problem, or caused limitations in his health and physical well-being. As the ALJ properly considered this evidence in his decision (Tr. 15), his determination that plaintiff is not consequently markedly limited in the domain of health and physical well-being is substantially supported by the record and should not be disturbed.

Finally, plaintiff's attribution of his illnesses to a "possible immune deficiency" is not supported by the record. The only reference to an immune deficiency is a recommendation from Dr. Taylor that plaintiff be tested for a possible immune deficiency for recurrent viral illness if plaintiff's primary care physician felt such testing was warranted. (Tr. 296). Yet, this testing was never done; thus, there is no evidence of record that plaintiff has an immune deficiency that the ALJ failed to consider in rendering his opinion.

In light of the above, the undersigned finds that the ALJ's determination that plaintiff had less than marked limitation in the domain of health and physical well-being is substantially supported by the record. Consequently, plaintiff's first assignment of error should be overruled.

---

experience ear infections in the future is an insufficient basis upon which to determine that he currently has a marked limitation in this domain.

[5] Dental caries are more commonly known as tooth decay, or cavities. *See* http://www.ncbi.nlm.nih.gov/pubmed/17208642 (last visited Aug. 4, 2012).

18

2. The ALJ's finding that plaintiff has less than marked limitation in interacting and relating to others is supported by substantial evidence.

Social Security Ruling 09-5p provides the following guidelines on evaluating a child's

limitations in the domain of interacting and relating to others:

> In the domain of "Interacting and relating with others," we consider a child's ability to initiate and respond to exchanges with other people, and to form and sustain relationships with family members, friends, and others. This domain includes all aspects of social interaction with individuals and groups at home, at school, and in the community. Important aspects of both interacting and relating are the child's response to persons in authority, compliance with rules, and regard for the possessions of others. In addition, because communication is essential to both interacting and relating, we consider in this domain the speech and language skills children need to speak intelligibly and to understand and use the language of their community.

> To interact effectively with others, children must understand how to approach another person or a group of people, and must know how to respond in an age-appropriate manner to others who approach them. They must be able to use not only words, but facial expressions, gestures, and actions. The child must also be able to use these forms of communication with different people and in different contexts throughout the day. . . .

> Both physical and mental impairments can affect a child's ability to interact with others. For example, a child with a hearing impairment or abnormality of the speech mechanism (such as a repaired cleft palate) may have speech that is difficult to understand. Such a child may have difficulty describing an event to strangers.

SSR 09-5p. This Ruling further provides examples of typical functioning in this domain for

children age one to age three:

- Begins to separate from caregivers, although is still dependent on them.

- Expresses emotions and responds to the feelings of others.

- Initiates and maintains interactions with adults.

19

- Begins to understand concept of 'mine' and 'his' or 'hers.'

- Shows interest in, plays alongside, and eventually interacts with other children.

- Communicates wishes or needs, first with gestures and later with words that can be understood most of the time by people who know the child best.

*Id.*

The ALJ determined that plaintiff has less than marked limitations in the domain of interacting and relating to others. Plaintiff contends the ALJ erred by failing to account for all of his limitations within the domain of interacting and relating to others. Specifically, plaintiff argues that the ALJ improperly concluded that plaintiff's improved scores in the Help Me Grow developmental assessments showed moderate and less than marked limitations. In support of his contention that he has a marked limitation in this domain, plaintiff cites to speech therapy findings showing plaintiff's receptive and expressive language skills are delayed (Tr. 289-91), test results from Butler County MRDD demonstrating that he tested below average in these areas (Tr. 300-24), and findings that plaintiff has not significantly progressed in his language skills. (Tr. 434-37). Plaintiff also contends the ALJ failed to account for plaintiff's hearing loss and its effect on his ability to communicate with others. Lastly, plaintiff asserts that the ALJ failed to consider the record as a whole, including notations that plaintiff was difficult to understand and had emotional problems, in determining that plaintiff had a less than marked limitation in his ability to interact and relate to others.

For the reasons that follow, the undersigned determines that the ALJ's decision finding less than marked limitation in the domain of interacting and relating to others is supported by substantial evidence.

First, the ALJ reasonably determined that plaintiff's personal and emotional abilities were age appropriate. Consistent with the skills identified as age-appropriate under SSR 09-5p, plaintiff at age 24 months demonstrated age appropriate interaction attachment skills, displaying appropriate eye contact, reciprocal smiling, affect, turn-taking, attention to the speaker, joint attention, and use of gesture and voice to gain attention. (Tr. 290-91). He demonstrated mastery and emerging capabilities in a multitude of interactions (Tr. 306) and, at age 25 months, plaintiff tested in the 21 to 24 month range for personal social and emotional development. (Tr. 20, 435). He showed care when handling small animals, avoided common dangers, helped with simple household tasks (e.g., dishes), and greeted familiar adults spontaneously. (Tr. 20, 435). At 29.5 months, plaintiff's personal/social and emotional skills again were assessed as age-appropriate, in the range of 24 to 30 months. (Tr. 20, 436). He valued his own property and used the word "mine" (Tr. 436) and his mother testified that plaintiff had a desire to be picked up or held by familiar people, showed affection toward people he knew, and played with other children independently. (Tr. 81-82).

Second, the ALJ acknowledged that plaintiff's delayed language development created limitations in the relevant domain and adequately considered its effect on plaintiff's functioning. (Tr. 20). The ALJ noted that plaintiff's receptive and expressive language skills improved following his cleft palate surgery. At age 21 months, plaintiff's demonstrable language skills

were below those generally found in children age 16 to 18 months (Tr. 14, citing Tr. 290, 292); he was difficult to understand at 25 months; and he became frustrated due to others' inability to understand him. *Id.*, citing Tr. 427. At 25 months, plaintiff was in the 24 month range for expressive communication and language skills, but in the 16 month range for receptive language skills. (Tr. 434). But by age 29.5 months, plaintiff's communication skills advanced to the 20 to 21 month level – "still lagging, but an improvement of four to five months realized in the four months since the earlier assessment." (Tr. 14-15, citing Tr. 434, 436). Given the evidence that plaintiff's communication skills steadily improved; Dr. DiTraglia's opinion that the evidence did not demonstrate that plaintiff had a marked limitation in the domain of interacting and relating with others; the absence of any evidence from a speech or behavioral therapist or medical profession opining that plaintiff has a marked limitation in this domain; plaintiff's normal social and emotional development; plaintiff's normal expressive communication skills; and evidence that plaintiff's delays in receptive communication were moderate and only one part of how his communications skills were evaluated, the ALJ's determination that plaintiff's limitations in interacting and relating with other was less than marked is substantially supported by the record.

Nevertheless, plaintiff argues the ALJ failed to properly consider the effect that his ear problems have on his language and communication skills. Contrary to plaintiff's argument, the ALJ thoroughly discussed plaintiff's receptive language deficits and, as explained above, there is no evidence that plaintiff has suffered hearing loss from his intermittent ear infections or other illnesses. Consequently, the ALJ did not err in this regard.

22

Plaintiff also argues that he has emotional problems, demonstrated by tantrums and biting, which the ALJ failed to address in evaluating plaintiff's functioning in the relevant domain. However, the record simply does not bear this out. There is no evidence documenting any abnormal behavioral problems and, with respect to the biting, the record indicates that plaintiff was merely responding to being bitten by his older sister. (Tr. 342). Moreover, plaintiff's mother testified that he had age appropriate development in this domain. (Tr. 81-82).[6] In consideration of these findings and observations, the ALJ's determination that plaintiff has a less than marked limitation in the domain of interacting and relating with others is substantially supported.

Lastly, plaintiff asserts that Dr. DiTraglia found plaintiff has a marked limitation in communication and misunderstood the standards for assessing children's disability issues. (Doc. 15 at 19, citing Tr. 50). The Court's review of the testimony cited by plaintiff reveals otherwise. A fair reading of Dr. DiTraglia's testimony indicates that in response to a hypothetical question about the threshold required for a "marked" limitation, Dr. DiTraglia testified that *if* a child's development were at half the chronological age, that would be evidence of a marked level of limitation, but that communication deficits should be assessed in the context of the entire domain. (Tr. 50). As there is no evidence that plaintiff's communication skills were half his chronological age, the ALJ did not err in declining to find a "marked" limitation in

---

[6] Plaintiff's mother testified that plaintiff demonstrated a desire to be picked up or held by familiar people; shows appropriate affection toward familiar people and dogs; enjoys playing with other children; is aware of the presence of other children; and can play independently in the company of his peers. *Id.*

23

communication based on Dr. DiTraglia's testimony or that the ME failed to understand how to assess limitations under the applicable Social Security regulations.

Plaintiff's second assignment of error should be overruled.

3. The ALJ did not err by failing to make an explicit credibility finding with regard to plaintiff's mother's testimony.

For his third assignment of error, plaintiff asserts that the ALJ erred by not making a specific credibility finding with respect to the statements provided by plaintiff's mother at the ALJ hearing and throughout the record to medical providers. Specifically, plaintiff claims the ALJ's notation that plaintiff missed four scheduled appointments with the Butler County MRDD amounts to an unfavorable credibility finding that is not supported by the record.

Plaintiff is correct that the ALJ did not make a specific credibility finding on the statements of plaintiff's mother. In the absence of any specific credibility determination, resolution of this issue turns on whether a different result would have been realized if plaintiff's mother had been found fully credible. Otherwise, the ALJ's failure make a credibility determination is harmless error. *See Thompson v. Comm'r of Soc. Sec.*, No. 1:10-cv-2, 2011 WL 766668, at *6 (W.D. Mich. Feb. 4, 2011) (the failure of an ALJ to detail his credibility determination "may constitute harmless error if the record demonstrates the claimant had a sufficient opportunity to voice his subjective complaints and if the record shows that the ALJ took those complaints into account."), *aff'd*, 2011 WL 765976 (W.D. Mich. Feb. 25, 2011) (citing *Spicer v. Apfel*, 15 F. App'x 227, 234 (6th Cir. 2001) (holding that harmless error occurred when ALJ accounted for subjective accounts in analyzing evidence as a whole). In this

24

case, any ostensible error committed by the ALJ is harmless as he fully considered the statements made by plaintiff's mother in finding that plaintiff was not disabled.

The ALJ's decision reflects that he relied on opinions from medical providers and therapists who, in turn, relied on plaintiff's mother's reports regarding his abilities, daily activities, and overall development. For example, the ALJ took into account notations from Dr. Manfroy that plaintiff "was limited in that the [plaintiff]'s mother was the only person who could feed him[,]" which was reported by plaintiff's mother. (Tr. 14, citing Tr. 230). The ALJ further considered plaintiff's mother's reports to Help Me Grow that plaintiff was difficult to understand which caused him frustration. *Id.*, citing Tr. 427. Despite these reports, there is no opinion from a medical provider or speech or developmental specialist who found that plaintiff had a marked limitation in any domain. Further, plaintiff has failed to identify how the ALJ's exclusion of a detailed credibility finding warrants a reversal of any of his substantially supported determinations.[7]

Lastly, as noted by plaintiff, the record indicates that although he missed four appointments with Butler County MRDD, on three of these occasions the appointments were cancelled at the request of the counselor and only one time did plaintiff seek to reschedule. *See* Tr. 355-58. However, there is nothing in the record to indicate that the ALJ improperly discounted the statements and/or testimony of plaintiff's mother in noting that plaintiff had

---

[7] Notably, there is evidence of record which would support discounting the testimony of plaintiff's mother. At the ALJ hearing, plaintiff's mother testified that plaintiff at age 30 months was unable to catch a ball (Tr. 69), but notations from Butler County MRDD include a counselor's observations that at age 25 months plaintiff was consistently catching a ball. (Tr. 434).

25

missed these appointments.  Consequently, the undersigned is unable to conclude that the ALJ

erred by merely noting the missed appointments without some indication that he improperly

discounted plaintiff's mother's testimony as a result.

     For the above reasons, plaintiff's third assignment of error should be overruled.

     4.  <u>The use of post-hearing interrogatories is a not violation of plaintiff's due process rights</u>.

     For his final assignment of error, plaintiff asserts that his due process rights were violated

when the ALJ relied on the ME's responses to a second set of interrogatories which related to

evidence submitted by plaintiff post-hearing.  After the hearing, plaintiff submitted records from

Children's Hospital emergency department and treatment records from Help Me Grow and

Butler County MRDD.  *See* Tr. 414-37.  Upon receipt, the ALJ sent a request to the ME seeking

his updated opinion in light of this new evidence. (Tr. 440).  The ME sent correspondence to the

ALJ stating that his opinions, as expressed at the hearing and in his previous interrogatory

responses (Tr. 407-13), had not changed after his review of the post-hearing evidence. (Tr. 439).

Plaintiff contends that the only information he received was the correspondence from the ME,

that the response was so minimal he could not respond to it in any meaningful way, and that the

ALJ's failure to more fully develop the record deprived him of his due process rights.

     "The fundamental requirement of due process is the opportunity to be heard 'at a

meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)

(quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  Disability claimants are entitled to

procedural due process at the hearing level as they have a property interest in the potential

benefits. *Flatford v. Chater*, 93 F.3d 1296, 1304 (6th Cir. 1996). To ensure that these due process rights are protected, ALJ hearings must be "full and fair." *Id*. at 1305. However, "due process does not require the Commissioner to allow a social security claimant upon request to cross-examine every physician providing post-hearing evidence in order for the hearing to be 'full and fair.'" *Id*.

In *Flatford*, the Sixth Circuit was confronted with a similar issue – whether a disability claimant has a due process right to cross-examine a doctor who provides a post-hearing opinion. *Id*. at 1299. However, unlike the instant case, the claimant's attorney in *Flatford* requested a supplemental hearing to cross-examine the doctor providing the interrogatory responses. *Id*. at 1298. The request was denied by the ALJ, but the attorney was permitted to submit additional interrogatories to the doctor. *Id*. After noting the nonadversarial nature of social security hearings, the *Flatford* Court held that claimants are not entitled to the due process rights of cross-examining all doctors providing medical opinions as interrogatories can provide "a meaningful opportunity for a disability claimant to confront the evidence he believes to be adverse to his claim." *Id*. at 1306.

Applying the rationale of *Flatford* to the instant case, the undersigned finds that plaintiff's due process rights were not violated by the ALJ's use of and reliance on the ME's response to post-hearing interrogatories. A review of the hearing transcript indicates that plaintiff and plaintiff's counsel were aware that the ALJ was intending to submit post-hearing interrogatories to the ME. *See* Tr. 56. Further, in his brief, plaintiff acknowledges that he received notice of the post-hearing interrogatories on May 27, 2010 (Doc. 15 at 22), over one

27

month before the ALJ issued his decision. Yet, neither plaintiff nor his attorney sought to re-open the record, hold another hearing, or submit their own interrogatories to the ME. In light of these facts, the Court finds that plaintiff had ample notice that the ALJ intended to rely on the ME's post-hearing opinion, but failed to invoke his due process rights to confront this adverse evidence. Plaintiff was not deprived of a meaningful opportunity to respond to this evidence or otherwise present his case.

Accordingly, the undersigned recommends that plaintiff's fourth assignment of error be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: 8/23/12

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ANGELA VANSELOW O/B/O,
D.R.V., MINOR,
    Plaintiff,

        vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:11-cv-616

Beckwith, J.
Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

29